4-9002                                        227 S. W. 2d 958

Opinion delivered February 20, 1950.

Rehearing denied April 10, 1950.

*Wm. J. Kirby,* for appellant.

*Gaughan, McClellan & Gaughan,* for appellee.

Griffin Smith, Chief Justice. The controversy involves undivided mineral interests that had been severed from the fee, and had forfeited for taxes. Act 221 of 1929, Ark. Stat's, § 84-203. Plaintiffs in six suits alleged invalid assessments and void sales, and asked that deeds issued by the Land Commissioner be cancelled. The Chancellor found, among other vices, that due

process had been denied, hence sales by the Collector were unauthorized. Since we have concluded that assessment methods, the manner of recording assessments, and faulty administrative procedure in dealing with the properties obscured from the taxpayer information that ought to have been conveniently accessible—matters sufficiently prejudicial to require avoidance of the deeds—we do not discuss all of the objections, disclosing numerous irregularities.

The causes were consolidated for trial because M. Sorkin, on April 6, 1944, had purchased all of the so-called forfeitures. He contends that five of the six groups of sales under which title is asserted received confirmation March 20, 1947. While conceding that a decree was rendered, and that it listed the mineral interests here contended for, appellees deny that the order affected them. Our holding here does not depend upon confirmation, or non-confirmation; nor are we concerned with the differences between the various mineral interests—whether royalty, leasehold, overriding, or a comprehensive lease or sale of "all minerals". Such expressions as "overriding", or "term", or "subject to", as used in the oil-producing areas to denote a particular ownership [insofar as this opinion extends] are included in mineral interests.

The local plan for collecting taxes on mineral interests did not follow the real property pattern. A special book of "Leases and Royalties' was kept. Where severance from the fee had been effectuated and the mineral interest alone was being dealt with, the transaction appears to have begun when the Assessor turned over his lists and the County Clerk received them for entry. The Clerk, in turn, certified mineral assessments to the Collector, but did not include them in the official record of real property. Rather, there was an attempt to list the presumptive owners alphabetically. As to this, a deputy in the County Clerk's office testified that it was not possible, without checking the entire list of almost four thousand names, to find a particular mineral

interest *by reference to land calls*. In other words, [said this witness] before a taxpayer could satisfy himself that a designated mineral interest he owned (or that some one else owned) was, or was not, on the book, it would be necessary to go over the full list,—"and this results from the fact that there is no order or system with reference to the land calls in assessing the minerals".

Question: "In the event I came to your office for the purpose of ascertaining whether a mineral interest I owned in the southwest quarter of the southwest quarter of section 32, township 15 south, range 17 west, had been assessed, is there any way I could ascertain that fact, or is there any method by which you could determine that fact for me, without inspecting every one of the hundreds of entries in this book?" Answer: "If it wasn't listed under your name, and it wasn't listed under the name of the person you bought it from, there would be no way without checking the entire book". The witness also said that on a number of occasions a name searched for had been found out of alphabetical order.

But the difficulty did not end here. Following the Assessor's recapitulation of ninety pages, and succeeding the Clerk's summary, there were special lists on pages 92 and 93,—about seventy-five names—representing persons, and the mineral interests there assessed. After the general tax book, and the book containing mineral assessments, had been delivered to the Collector, names were added from time to time. "Chances were" that the Clerk would take the books back to his office. However, if but one or two changes were to be made, some one from the Clerk's office usually came to the Collector's office and did the work. The first list, containing more than 3,500 names, showed (in comparison with the second list) a payment ratio of about thirty to one.

. . . .

It has long been the duty of the County Clerk to make and deliver to the Assessor, "in a book prepared for that purpose", an abstract of lands. In listing acre-

age, this abstract "shall commence . . . in the lowest number of township and range in [the] county, and in the northeast corner in each township, and shall proceed numerically with all the sections, townships, and ranges, . . . first setting down all the subdivisions of each section as they belong to individuals, or the whole section together if owned by one person and not divided on account of parcels being of different values". Ark. Stats, § 84-402.

It is interesting to note that this language has been brought from the Act of March 31, 1883, § 85. It was repeated in Act of March 28, 1887, an Act mentioned by Chief Justice HART in *Rives* v. *Woodruff County,* 179 Ark. 1110, 20 S. W. 2d 184. The next appearance is in Act 172 of 1929, then in Act 72 of 1931. As now expressed, the enumerated duties assigned to the County Clerk are followed by a paragraph saying: "No failure to observe any of these requirements shall be held to vitiate any assessment if the land be so described as to be identified".

Authority for assessing mineral interests when severed from the fee was conferred by Act 30 of 1897.[1] Eight years later, Act 303 of 1905,[2] timber was dealt with; but the 1905 enactment appears to have been taken in substance from the Act of 1897, with § 2 as a method directive. It tells the Assessor to evaluate and list these rights, with descriptions, and to enter them *on the real estate tax books.* The assessment must be marked "timber", and if the taxes be not paid ". . . the [interest] shall be advertised with a description of the land as 'timber', giving the character and kind of such timber, . . . and said timber shall be sold as now provided by law for the sale of delinquent lands".

The statute applicable to delinquent mineral interests provides that when a forfeiture occurs these interests ". . . shall in all things be certified to, and redeemed in the same manner as is now provided for the certification and redemption of real estate upon which taxes duly assessed have not been paid".

[1] Ark. Stat's, § 84-203.
[2] Ark. Stat's, § 84-432.

A thread of legislative similarity runs clearly through these related statutes, beginning with 1883 and coming down to 1931. One is not idly considering remote possibilities when he assumes that the lawmakers (although not as specific in dealing with minerals as they were in providing for the assessment of timber) did not leave this seeming hiatus because they thought one class of property was less intimately connected with the land than was the other. We see no logical reason for thinking there was an *intended* variant. The explanation of administrative officers that an alphabetical arrangement is more convenient is not controlling. The minerals, being primarily an interest in the land, are severable *only* because the legislative authority has made them so; yet for taxing purposes they are so closely related to the realty that ownership identification and accuracy make it well-nigh imperative that the mineral listings be subjoined to the land assessments. Any method that destroys this unilateral relationship burdens ready determination when an owner seeks information respecting the status of his interest at a given time.

Appellant contends that the confirmation decree is conclusive of all matters not going to the power to sell, and for this reason he contends that five of the six complaints must of necessity fail.

One of the suits was filed Sept. 25, 1946, with confirmation March 20, 1947—not quite six months after the actions were commenced. The statutory authority for confirmation, § 84-1325, does not of itself cut off all rights. It allows the property owner, by appropriate pleadings filed within a year, to attack the adjudication, in so far as it affects property of the complainant or interveners; and this may be done ". . . either in the same cause in the said Chancery Court, or in a separate cause in the same or any other court of competent jurisdiction, [and] upon any ground which would have constituted a meritorious defense to the complaint upon which the decree was rendered; and any such attack, made within the said one-year period, . . . shall be taken to be [a] direct attack as of the same term when

the said decree was rendered". Actions in derogation of the decree, if brought *after* a year, "shall be taken to be collateral attacks". See Act 423, approved March 31, 1941.

The mineral interests in litigation here were in Ouachita County, and the suit in case No. 5915 was filed within the allowable period. The attack, as to it, was direct, permitting the plaintiffs to avail themselves of any defenses based upon prejudicial irregularities. But our decision rests upon the proposition that the procedure legislatively intended was not followed. Instead, there was a course of well-intentioned administrative conduct that deprived the property owners of the process provided for assessing and selling. This means that the power to sell was lacking.

It is not necessary, in disposing of these cases, to say whether the confirmation decree of 1947 was sufficiently specific to convey the mineral interests; but attention is called to the marginal note.[3]

Affirmed.

[3] Caption of the decree is: "State of Arkansas against delinquent lands in Ouachita County forfeited for non-payment of taxes and sold to the State." Pertinent textual language is: ". . . And no one having appeared to make defense to any of the lands mentioned in the complaint, . . . and the Court being fully advised doth find that the lands hereinafter described, and each and every tract thereof, have heretofore been forfeited and sold to the State; . . . that the time for redemption of said lands [has expired]; . . . that the State of Arkansas is now the owner of said lands, and that the title in and to said lands should be forever quieted, confirmed, and vested in the State in fee simple. . . . Wherefore, it is by the Court . . . decreed that the various sales for non-payment of taxes upon the various tracts of land [be confirmed]." The Clerk was directed to make copies of the decree and send them to the Land Commissioner, "showing the disposition of each tract or parcel of land." Jurisdiction was retained to make further orders "from time to time as to all lands described in the plaintiff's complaint." And finally, title "to said lands and each and every tract thereof as herein described" was confirmed in the State.

The description of confirmed interests was headed, "List of State Lands in Ouachita County Forfeited for 1940 Taxes." Following the list of forfeited lands, but not connected with them descriptively, there is a one-line sub-heading, "Mineral Rights Only." The presumptive owner's name then appears, followed by a survey description of the interest, with such terms as "R. I.", "M. I.", "Lse. I.", etc. In one case the description was, "87/122880 of 1/8 R. I."

## ON REHEARING

GRIFFIN SMITH, Chief Justice. In his brief on rehearing appellant, as petitioner, correctly says that but one of the six complaints was filed within a year of confirmation. However, the decree was introduced in evidence. It, with relevant testimony, showed that assessments in all of the cases were made in the same manner. The result we reached was not predicated upon confirmation or the want of confirmation. In discussing the assessments it was said that the power to sell was lacking. The petition for rehearing is denied.